IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIWA TROUTMAN, | C-04-0889 MMC |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT** |
| v. | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

Before the Court is the motion, filed by defendant The Trust for Public Land Long Term Disability Plan ("the Plan"),[1] for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Aiwa Troutman has filed opposition thereto, to which defendant has replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for decision without oral argument, see Civil L.R. 7-1(b), and rules as follows.

---

[1] On November 5, 2007, plaintiff and then defendant Unum Life Insurance Company of America ("Unum") stipulated to dismissal of Unum and amendment of the complaint to name the Plan as defendant. (See Stip. to Substitute Proper Party ¶¶ 1-3.) The parties further stipulated that "[t]he Answer, Motion for Summary Judgment, and other pleadings filed by Defendant Unum shall be deemed to be the Plan's Answer, Motion for Summary Judgment, and other pleadings in this Action." (See id.) The Court approved the stipulation by order dated November 6, 2007.

**BACKGROUND**

**A. Plaintiff's Employment and Medical History**

Plaintiff was insured under a long-term disability insurance policy ("the Policy") administrated by Unum as part of an employee benefit plan offered by plaintiff's employer, The Trust for Public Land ("the Trust"), where she held the position of Director of Financial Planning and Analysis. On June 21, 2000, plaintiff slipped and fell down several stairs while at work, twisting her back and injuring her left ankle. (See Supp. Decl. of Horace W. Green in Support of Def.'s Mot. for Summary J. Ex. C at U/A 0088.) Subsequent to her accident, plaintiff continued working for the Trust on a full-time basis, (see id. Ex U at U/A 0412), until she ceased active employment on August 31, 2000, (see id. Ex. L at U/A 0197). The Trust then provided plaintiff 20 days' severance leave through September 20, 2000. (See id.)

On June 23, 2000, two days after plaintiff's June 21, 2000 fall, plaintiff sought treatment from Andrew Miller, M.D. ("Dr. Miller"). (See id. Ex. B at U/A 0097.) On a form titled "Doctor's First Report of Occupational Injury or Illness" ("First Report"), Dr. Miller noted plaintiff had suffered a left ankle sprain and parathoracic/paralumbar spasm, and checked a box indicating plaintiff was not "able to perform usual work." (See id.) That same date, on a form titled "Work Status Report," Dr. Miller specified plaintiff was able to perform "modified work" with the following limitations: "No Stooping or Bending," "No Lifting or Exerting Push/Pull Forces Over 15 pounds," and "Must Alternate Sitting and Standing as Needed." (See id. at U/A 0098.)

On July 18, 2000, plaintiff was treated by orthopedist Jeffrey L. Halbrecht, M.D. ("Dr. Halbrecht"). (See id. Ex. C at U/A 0088-89.) Dr. Halbrecht's "impression" was that plaintiff had "lumbar strain that is not resolving," and that "[h]er ankle has pretty much resolved." (See id. at U/A 0089.) He recommended ongoing therapy without surgical intervention or other aggressive treatment. (See id.)

On October 19, 2000, Dr. Halbrecht saw plaintiff a second time "for followup evaluation of her back complaints," (see id. Ex. D at U/A 0090), and noted plaintiff

2

continued to have "symptoms of scapuluthoracic bursitis and crepitus," (see id.). Dr. Halbrecht was of the opinion that "the patient could be returned to full duties at this point," observing, however, that plaintiff was no longer employed by the Trust. (See id.)

On November 30, 2000, Dr. Halbrecht again saw plaintiff, and thereafter completed a "Treating Physician's Permanent and Stationary Report." (See id. Ex. E at U/A 0083-85.) Dr. Halbrecht noted plaintiff continued to suffer from "persistent scapulothoracic bursitis and lumbar strain with left sacroiliac joint involvement." (See id. at U/A 0084.) At that point he considered plaintiff's injuries to be "Permanent and Stationary for rating purposes," further noting, such disability "may affect her future employment." (See id.) Under "Work Restrictions," Dr. Halbrecht wrote: "The patient is precluded from "VERY HEAVY LIFTING ACTIVITIES AND REPETITIVE BENDING OR TWISTING ACTIVITIES."[2] (See id. (emphasis in original).)

On July 13, 2001, plaintiff requested authorization from her worker's compensation insurance provider to see a physician for her back pain. (See id. Ex. BB at U/A 0441). On July 30, 2001, the requested authorization was given, (see id. at U/A 0442); on October 9, 2001, plaintiff saw Edward N. De Mayo, M.D., F.A.C.S. ("Dr. De Mayo"), (see id. at U/A 0443). Dr. De Mayo noted that plaintiff continued to suffer from back pain and was "unable to work at this time." (See id.) He also referred plaintiff to neurologist Tracy Newkirk, M.D. ("Dr. Newkirk"). (See id.)

On December 14, 2001, Dr. Newkirk evaluated plaintiff. (See id. Ex. G at U/A 0071-73.) Dr. Newkirk was of the opinion that plaintiff was "not permanent and stationary," and recommended physical therapy, anti-inflammatory medications, and "possibly a clavicle brace." (See id. at U/A 0073). While acknowledging plaintiff was "having difficulty working,

---

[2] In her opposition, plaintiff asserts: "Dr. Halbrecht told [her] . . . he was required to write a permanent and stable conclusion with limited restrictions and discharge her because the workers comp insurance would no longer cover her treatment. This statement was untrue." (See Pl.'s Opp'n at 3:23-25.) The only reference to such contention in the administrative record is contained in plaintiff's final appeal to Unum, dated June 10, 2003, wherein plaintiff makes the same assertion. (See U/A at 431-32.) Plaintiff, however, points to no evidence in the record in support thereof.

3

understandably, since sitting, standing, and walking are all affected by this injury," Dr. Newkirk was of the opinion that plaintiff was "not disabled from work" and that her condition was "fully correctable." (See id.)

On January 22, 2002, in connection with a follow-up evaluation that date, Dr. Newkirk, in a Progress Report, noted plaintiff had been temporarily totally disabled since June 21, 2000 and that plaintiff had been instructed that she could return to "modified work" on May 1, 2002. (See id. Ex. H at U/A 0076.) From January 22, 2002 through March 24, 2003, Dr. Newkirk continued to evaluate plaintiff in periodic Progress Reports, (see id. Ex. BB at U/A 0448-459), in each instance noting plaintiff remained temporarily totally disabled.[3] (See id.)

**B. Unum's Review of Plaintiff's Claim for Benefits**

By letter dated July 9, 2002, Unum, as claims administrator, notified plaintiff that, under the terms of the Policy, plaintiff was ineligible for long-term disability benefits. (See id. Ex. Q at U/A 0390-93.) Customer Care Specialist Anna Olimpiada ("Olimpiada") explained to plaintiff therein that reports from Dr. Miller, Dr. Halbrecht, Dr. De Mayo, and Dr. Newkirk, as well as Unum's vocational assessment and review of plaintiff's medical records "did not adequately support a severity in [plaintiff's] condition or continuous impairment throughout [the] 90 day elimination period." (See id. at U/A 0390-391.) Olimpiada further explained that the medical data indicated plaintiff was restricted only from "very heavy lifting activities and repetitive bending or twisting activities," (see id. at U/A 0391), and that Unum's vocational specialist classified plaintiff's occupation at the "sedentary labor level," (see id.).[4] Consequently, Olimpiada explained, plaintiff was "not

---

[3] To the extent Dr. Newkirk continued to evaluate plaintiff after March 2003, the reports pertaining to such evaluations are not part of the administrative record.

[4] On July 1, 2002, Unum's Vocational and Rehabilitation Department completed a review of plaintiff's occupational duties. (See id. Ex. P at U/A 0384-85.) Kimberlee Foye, M.Ed., CRC ("Foye") determined plaintiff's occupation to be "sedentary work," (see id. at U/A 0384), with any "strength" involved being at a "sedentary" level, i.e., "[l]ifting, [c]arrying, [p]ushing, [p]ulling 10 Lbs. occasionally"; such work involves "[m]ostly sitting" and "may involve standing or walking for brief periods of time," but "never" requires "stooping," "kneeling," or "crouching," (see id. at U/A 0385).

4

1 precluded from performing each of the material duties of [plaintiff's] regular occupation."
2 (See id.)

3 On July 10, 2002, Olimpiada contacted plaintiff by telephone to explain Unum's
4 decision and to alert her that she would be receiving the above-referenced letter. (See id.
5 Ex. R at U/A 0394.) In their telephone conversation, Olimpiada reiterated that Unum had
6 "reviewed records from all of [plaintiff's] treating providers and found that there was not
7 objective evidence to support a serious impairment" throughout plaintiff's [elimination
8 period]. (See id.)

9 On July 24, 2002, plaintiff sent a letter stating she was appealing Unum's decision.
10 (See id. Ex. S at U/A 0395.) With her letter, plaintiff enclosed Dr. Miller's First Report of
11 June 23, 2000, along with Progress Reports from Dr. Newkirk dated January 22, 2000 and
12 March 4, 2002. (See id. at U/A 0396-398.)

13 On August 30, 2002, Lead Appeals Specialist Annie Hong ("Hong") notified plaintiff
14 by letter that the decision to deny plaintiff's claim had been upheld. (See id. Ex. T at U/A
15 0400.) In particular, Hong noted that in June and July 2000, Dr. Miller had indicated
16 plaintiff was "unable to perform [her] usual work," and had "stated specific restrictions and
17 limitations," namely, "no lifting greater than 10 pounds, no stooping or bending, no
18 overhead work, and alternating between sitting and standing." (See id. at U/A 0401.) Hong
19 further explained that in November 2000, Dr. Halbrecht, consistent with Dr. Miller, had
20 found plaintiff's "permanent work restrictions included preclusion from very heavy lifting and
21 repetitive bending or twisting activities," (see id.), and that medical reports by Dr. Newkirk
22 and Dr. De Mayo from late 2001 could not be used to attest to plaintiff's medical condition
23 in November 2000. (See id. at U/A 0401-02.) Additionally, Hong explained that because
24 plaintiff's elimination period ended November 30, 2000, any worsening of her condition
25 after that date was not covered under the Policy. (See id. at U/A 0402.)

26 On October 1, 2002, plaintiff wrote to Hong, expressing her disagreement with the
27 decision. (See id. Ex. V at U/A 0418.) In particular, plaintiff was concerned that the
28 decision had been based solely on Dr. Halbrecht's findings; plaintiff cited Dr. Miller's First

5

1 Report and Dr. Newkirk's later reports and reiterated her claim that her date of disability
2 should be June 21, 2000.  (See id. Ex. X at U/A 0420-21.)

3       In a letter dated November 4, 2002, Hong explained to plaintiff that the review
4 process had included "all medical information contained in [plaintiff's] file."  (See id. Ex. Y at
5 U/A 0423.)  Hong further advised plaintiff that because plaintiff had continued to work and
6 receive full pay through August 2000, under the terms of the Policy, plaintiff's "date of
7 disability" would be September 1, 2000.  (See id.)

8       On March 2, 2003, plaintiff notified Hong that she planned to send "more medical
9 evidence."  (See id. Ex. Z at U/A 0427.)  On March 25, 2003, Hong reiterated Unum's
10 decision to deny benefits, but offered to review "additional information . . . that would
11 pertain to any conditions that began before [plaintiff's] coverage under [the Policy] ended
12 on November 30, 2000."  (See id. Ex. AA at U/A 0429-30.)

13       By letter dated June 10, 2003, plaintiff objected to Unum's determination and
14 provided Unum with medical reports already considered by Unum as well as new medical
15 reports from 2002-2003.  (See id. Ex. BB at U/A 0431-68.)  On June 24, 2003, Hong again
16 informed plaintiff of Unum's reasons for denying plaintiff's claim.  (See id. Ex. CC at U/A
17 0470-71.)  Hong further explained that plaintiff's newly-submitted reports were not relevant,
18 since the reports were written two to three years after plaintiff's coverage under the policy
19 ended.  (See id. at U/A 0470.)  Hong concluded her letter by advising plaintiff that the
20 decision to deny plaintiff's claim would remain final.  (See id. at U/A 0471.)  On March 4,
21 2004, plaintiff filed the instant action.

**DISCUSSION**

Under the Policy, "disability" and "disabled" are defined as follows:

"Disability" and "disabled" mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; and

2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience; or

6

3.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

   a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

   b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

(See id. Ex. A at U/A 0338.) Coverage under the Policy ceases on "the date employment terminates." (See id. at U/A 0347.)[5]

**A. Standard of Review**

In a prior order issued herein, the Court, relying on Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006), determined that it would "review for abuse of discretion Unum's denial of plaintiff's claim for disability benefits, taking into consideration Unum's conflict of interest as one factor in determining whether Unum abused its discretion." (See Order Granting in Part and Den. in Part Pl.'s Mot. to Determine Scope of Review, filed July 23, 2007, at 5:5-8.)

"[A]n insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest." See Abatie, 458 F. 3d at 965. Where the insurer acts under such a conflict of interest, the Court conducts "abuse of discretion review . . . informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." See id. at 967. As the Ninth Circuit has explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of the evidence in the record.

---

[5] To the extent there is any question as to the date of plaintiff's termination, specifically, whether the appropriate date is August 31, 2000, i.e., plaintiff's last day of full-time employment, or September 20, 2000, i.e., the last day of plaintiff's severance leave, such discrepancy is not material to any issue raised by the instant motion. Accordingly, for purposes of the discussion herein, the Court will use September 20, 2000 as plaintiff's termination date.

7

See id. at 968-69 (citations omitted).  In weighing the impact of a conflict of interest on a decision to deny a claim for benefits, a district court "is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." See id. at 969.

Generally, "a district court may review only the administrative record when considering whether the plan administrator abused its discretion." See id. at 970.  The court may, however, "consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." See id.  "[O]nce the conflict (if any) has been established, by extrinsic evidence or otherwise," however, "the decision on the merits . . . must rest on the administrative record." Id.

Subsequent to the Court's order determining the applicable standard of review, the United States Supreme Court issued its decision in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), setting forth therein the procedure to be followed by a reviewing court where "a plan administrator both evaluates claims for benefits and pays benefits claims." See id. at 2348.  In analyzing the issue, the Supreme Court held the standard of review remains deferential rather than de novo, see id. at 2350, and that structural conflict is a "factor" to be "taken into account" along with any other relevant factors, see id. at 2351.  As the Supreme Court further explained, such conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." See id. at 2351.

This Court sees no inconsistency between the Ninth Circuit's holding in Abatie, on

1  which this Court earlier relied, and the Supreme Court's recent decision in <u>Metropolitan</u>
2  <u>Life</u>, and, accordingly, will proceed in accordance with its order of July 23, 2007.  Further,
3  in light of <u>Metropolitan Life</u> and <u>Abatie</u>, the Court will construe the parties' respective
4  motions for summary judgment as motions for judgment under Rule 52 of the Federal
5  Rules of Civil Procedure, in order that the Court, in applying the proper standard of review
6  under such authority, may weigh evidence relevant to any conflict of interest bearing on
7  defendant's exercise of discretion.

**1.  Structural Conflict of Interest**

Plaintiff seeks to introduce the following documents extrinsic to the administrative record: (1) Dr. Newkirk's final medical report dated September 11, 2006 (<u>see</u> Decl. of Burton C. Allyn, IV in Opp'n to Def.'s Motion for Summary J. ("Allyn Decl.") Ex. T-1); (2) reports dated December 9, 2004, June 7, 2005, and January 12, 2006, from G. James Avery, M.D. ("Dr. Avery") (<u>see</u> <u>id.</u> Ex. T-2); (3) a Social Security Administration ("SSA") notice of decision and award dated February 13, 2004 ("SSA February 13, 2004 decision"), (<u>see</u> <u>id.</u> Ex. T-3); (4) plaintiff's application for reassessment dated July 27, 2007,[6] (<u>see</u> Allyn Decl. Ex. T-4); (5) Unum's acknowledgment of receipt of plaintiff's application for reassessment, dated July 30, 2007, (<u>see</u> <u>id.</u> Ex. T-5); (6) Unum's denial of plaintiff's application for reassessment, dated July 31, 2007, (<u>see</u> <u>id.</u> Ex. T-6); (7) a Letter Opinion from the California Department of Insurance, dated February 26, 2004, (<u>see</u> <u>id.</u> Ex. T-7); and (8) e-mail from plaintiff to former Trust supervisor Tod Dobratz ("Dobratz"), dated

---

[6] On October 3, 2005, Unum reached a settlement with the California Department of Insurance, in which Unum agreed to reassess claims of eligible claimants.  In 2006, the parties agreed to suspend the instant litigation while plaintiff submitted an application for reassessment.  (<u>See</u> Joint Case Management Statement, dated March 3, 2006.)  Plaintiff's original deadline for submitting her application was December 18, 2006; upon plaintiff's request, however, Unum granted an extension through February 26, 2007.  (<u>See</u> Def.'s Case Management Statement, dated May 4, 2007, at 2:16-19.)  On March 30, 2007, plaintiff requested a second extension.  (<u>See</u> <u>id.</u> at 2:19-21.)  On April 5, 2007, Unum informed plaintiff that she had failed to deliver the application by the agreed extension deadline and refused to reassess plaintiff's claim.  (<u>See</u> <u>id.</u> at 2:21-24.)  Despite such refusal, plaintiff, on July 27, 2007, submitted her reassessment application.  (<u>See</u> Allyn Decl. Ex. T-4.)  Unum initially responded with an acknowledgment of receipt, (<u>see</u> <u>id</u>. Ex. T-5), but the following day rejected plaintiff's late application, reiterating that plaintiff had submitted her application well beyond the extended deadline, (<u>see</u> <u>id</u>. Ex. T-6).

July 7, 2000, (see id. Ex. T-8).  The Court considers said documents solely for the purpose of determining "the nature, extent, and effect on the decision-making process of any conflict of interest."  See Abatie, 458 F.3d at 970.

The above-referenced reports from Dr. Newkirk and Dr. Avery (see Allyn Dec. Exs. T-1 and T-2), were prepared long after Unum made its final decision; indeed, they were prepared after plaintiff filed the instant lawsuit.  Consequently, such extrinsic evidence is not relevant to Unum's decision to deny benefits in 2003.

With respect to the SSA's February 13, 2004 decision (see id. Ex. T-3), plaintiff points out that under the terms of a multi-state settlement agreement entered in November 2004, Unum agreed to reassess claims and, in conjunction with such reassessment, agreed to "give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability."  (See Allyn Decl. Ex. U/A 472-500 at U/A 483.)  Because the language on which plaintiff relies operates prospectively only, such contractual condition, absent a reassessment, has little bearing on a decision issued, as here, in 2003.  See Madden v. ITT Long Term Disability Plan, 914 F. 2d 1279, 1283-86 (9th Cir. 1990) (holding plan fiduciary did not abuse discretion in crediting medical evidence in record showing lack of disability notwithstanding social security award in favor of claimant); see also Wallace v. Intel Corp., 2005 U.S. Dist. LEXIS 32515, at *25-28 (D. Az. 2005) (holding plan fiduciary need not consider SSA findings; further holding no inference of conflict to be drawn from failure to consider such findings).

As noted, plaintiff's claim was not reassessed.  Plaintiff argues, however, that documents pertaining to plaintiff's application for reassessment, (see Allyn Decl. Ex. T-4; Allyn Supp. Decl. Exs. T-5, T-6), evidence Unum's bad faith in the handling of her claim.  In particular, plaintiff argues, Unum initially "accepted her reassessment," (see Pl.'s Opp'n at 5:16-17) and then  "changed its position" by "rejecting the reassessment application as untimely," (see id. at 5:17-18).  Before Unum assertedly  "chang[ed] its position," however, Unum notified plaintiff that she had missed the deadline for submitting her application for reassessment, a deadline that Unum already had twice extended, and consequently, that

1 her late-filed application would not be considered.  (See Def.'s Case Management
2 Statement, filed May 4, 2007, at 2:21-24.)

3    Plaintiff further argues that the settlement agreement is "evidence of past
4 misconduct." (See Pl.'s Opp'n. at 6:25-26.)  Settlement agreements are not, however,
5 admissible as evidence of liability.  See Fed.R.Evid. 408(a).  Moreover, the settlement
6 agreement expressly provides that it shall not be offered by the parties thereto as "evidence
7 of or an admission. . .or concession of any liability or wrongdoing whatsoever," and further
8 that "[Unum] does not admit, deny or concede any actual or potential fault, wrongdoing or
9 liability in connection with any facts or claims that have been or could have been alleged
10 against it."  (See Allyn Decl. at U/A 494.)  The Court nonetheless will consider the fact that
11 concerns about Unum's claims-handling practices were raised, and, in reviewing the instant
12 determination, will apply a higher level of skepticism than otherwise would be warranted
13 based solely on a structural conflict.

14    Plaintiff next requests the Court consider a February 26, 2004 California Department
15 of Insurance Letter Opinion ("Letter Opinion"), wherein the California Insurance
16 Commissioner states discretionary clauses in disability insurance policies are in violation of
17 California law.  (See Allyn Decl. Ex. T-7.)  The Letter Opinion is inapplicable to the instant
18 claim, however, as the Policy's effective date is January 1, 1994.  (See Green Supp. Decl.
19 Ex. A.) "Assuming that the [Insurance] Commissioner may prohibit insurance companies
20 from using this discretionary clause in future insurance contracts, he cannot rewrite existing
21 contracts so as to change the rights and duties thereunder."  See Saffon, 522 F.3d at 867
22 ("Even if federal law permitted states to nullify an ERISA plan's grant of discretionary
23 authority, California law doesn't authorize the Commissioner to do so retroactively.")

24    Lastly, plaintiff notes that Unum, in the instant motion, remarked that plaintiff was
25 terminated for "poor performance," (see Def.'s Mot. at 7:7-8; Pl.'s Opp'n at 9:12-22); in that
26 regard, plaintiff asks the Court to consider a July 7, 2000 e-mail exchange between plaintiff
27 and her former supervisor Dobratz, in which they discuss the relationship of plaintiff's injury
28 to her repeated late arrivals at work, (see Allyn Decl. Ex. T-8).  Plaintiff relies on the e-mails

1 as evidence that Unum provided "inconsistent reasons" for Unum's denial of her claim.
2 (See Pl.'s Opp'n at 9:12-22.) There is, however, no inconsistency. The Trust's decision to
3 terminate plaintiff's employment and any reasons proffered therefor, the propriety of which
4 is not before this Court, are not attributable to Unum, a separate entity, which was
5 responsible for making a different determination, specifically, whether plaintiff demonstrated
6 she was "disabled" as defined under the Policy.

7 Accordingly, for the reasons stated above, the Court will apply an analysis using the
8 abuse of discretion standard, tempered by a moderate amount of skepticism.

**B. Unum's Exercise of Discretion**

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bell, 410 F.3d 1173, 1178 (9th Cir. 2005) (citations omitted). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court, after considering all the evidence, is left with the definite and firm conviction that a mistake has been committed." Id. The decision of an ERISA plan administrator will be upheld "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." See id. (internal quotation omitted).

"The mere fact that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous." Snow v. Standard Life Ins. Co., 87 F.3d 327, 331 (9th Cir. 1996). The clearly erroneous standard "does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Id. at 331-32 (internal quotation, alteration, and citation omitted).

Plaintiff does not contend that Unum failed to explain its denial or misconstrued the terms of the Policy. Rather, plaintiff argues Unum's decision was based on clearly

erroneous findings of fact. In particular, plaintiff claims that Unum "unreasonably ignored and continues to ignore compelling information that plaintiff was disabled beginning on her last day of work, . . . and has been disabled ever since." (See Pl.'s Opp'n at 1:23-25.) As noted, the Policy provides that an employee is eligible for benefits if, due to injury or sickness, such employee "cannot perform the material duties of his regular occupation." (See Green Supp. Decl. Ex. A at U/A 0338.) The issue thus before the Court is whether Unum abused its discretion in finding plaintiff could, at the time of her termination on September 20, 2000, perform the material duties of her regular occupation.

      The record in the instant case contains substantial evidence supporting Unum's conclusion that plaintiff's condition did not preclude her from performing the material duties of her regular occupation. In particular, Unum had before it the following evidence: Dr. Miller's reports restricting plaintiff from performing her usual work to the extent such work entailed lifting more than 15 pounds, stooping/bending, and/or did not allow for alternating sitting and standing, (see id. Ex. B at U/A 0097-98); Dr. Halbrecht's October 19, 2000 report stating "the patient could be returned to full duties," (see id. Ex. D at U/A 0090); Dr. Halbrecht's November 30, 2000 report characterizing plaintiff's "subjective complaints" as "frequent-slight discomfort in the periscapular area" and "occasional-minimal discomfort in the lumbosacral region," and restricting plaintiff from "very heavy lifting activities and repetitive bending or twisting activities," (see id. Ex. E at U/A 0084); Dr. Kile's independent medical review of plaintiff's submitted medical records, which review found Dr. Halbrecht's report and restrictions to be "reasonable," (see id. Ex. O at U/A 0375); and the report from Unum's Vocational Rehabilitation Department, evaluating plaintiff's occupation and classifying it as "sedentary work." (see id. Ex. P at U/A 0384-85). Significantly, Unum's determination relied primarily on the opinions of plaintiff's treating physicians.

      Plaintiff asserts that Unum ignored the section of Dr. Miller's First Report wherein Dr. Miller, in response to the question "Is patient able to perform usual work?," checked "No." (See id. Ex. B at U/A 0097.) The record, however, does not support plaintiff's assertion that Unum disregarded Dr. Miller's findings. First, it is clear that Unum considered Dr.

Miller's First Report and, indeed, in reviewing plaintiff's appeal, expressly referred to Dr. Miller's assessment that plaintiff was "unable to perform [her] usual work." (See id. Ex. T at U/A 0401 (discussing Dr. Miller's findings in August 30, 2002 letter to plaintiff).) Further, Dr. Miller's notation that plaintiff was not "able to perform usual work," must be read in context. Immediately below that entry, the form provides a place to indicate whether the patient can return to "regular work" or "modified work" and, if the latter, to specify "restrictions." (See id. Ex. B at U/A 0097.) In the space provided, Dr. Miller specified restrictions, which are the same restrictions listed in his "Work Status Report" completed that same day, (see id. at U/A 0098), wherein Dr. Miller expressly stated plaintiff was able to perform her work if "modified" with the restrictions specified. (See id.) Taken together, Dr. Miller's reports of June 23, 2000, are reasonably interpreted as allowing plaintiff to perform the material duties of her regular occupation, provided such duties did not include the activities covered by the restrictions specified therein. As noted, the Occupation Report prepared by Unum's Vocational Rehabilitation Department classified plaintiff's position as "sedentary work." That class of work does not include activities from which plaintiff was restricted. (See id. Ex. P at U/A 0384.) Consequently, Dr. Miller's opinion supports Unum's determination that plaintiff was not disabled as defined in the Policy.

Plaintiff further asserts that Unum ignored Dr. Halbrecht's statement that plaintiff's injuries persisted and "may affect her future employment." (See id. Ex. E at U/A 0084.) Dr. Halbrecht's statement, which is included in his report of November 30, 2000, does not refer to plaintiff's work at the Trust. As noted, Dr. Halbrecht, in his report of October 19, 2000, was aware that plaintiff "had left her job with the Trust," and was of the opinion that she could have been "returned to full duties" at that time, had she still been working there. (See id. Ex. D at U/A 0090.) Significantly, Dr. Halbrecht does not indicate plaintiff is precluded from performing all work activities, but rather, consistent with other statements in Dr. Halbrecht's report, only those that, as Dr. Halbrecht emphasized, require "VERY HEAVY LIFTING ACTIVITIES AND REPETITIVE BENDING OR TWISTING ACTIVITIES." (See id. Ex. E. at U/A at 0084) (emphasis in original). Plaintiff does not claim that her job required

14

very heavy lifting, repetitive bending, or twisting, nor does the record support such a finding.  Consequently, Dr. Halbrecht's opinion supports Unum's determination that plaintiff was not disabled as defined in the Policy.

Plaintiff next asserts that Unum ignored Dr. Newkirk's reports submitted in the period from January 22, 2001 through March 24, 2003, in which Dr. Newkirk offered the opinion that plaintiff was disabled as of the date of her accident in June 2000. (See Allyn Decl. Ex. U/A 448-459.)  As Unum explained to plaintiff, however, any evaluation by Dr. Newkirk in December 2001 or thereafter was too remote in time to constitute a reliable assessment of plaintiff's condition as of the relevant period in 2000, (see Green Supp. Decl. Exs. AA, CC), or to outweigh contemporaneous reports submitted by Dr. Miller in June 2000, (see id. Ex. B at U/A 0097-98), and by Dr. Halbrecht in July 2000, (see id. Ex. C at U/A 0088-89), October 2000, (see id. Ex. D at U/A at 0090), and November 2000, (see id. Ex. E at U/A 0083-85).  Moreover, in his first evaluation, prepared December 14, 2001, Dr. Newkirk described plaintiff's condition as a "strain" that was "fully correctable" and, significantly, was of the opinion that plaintiff was "not disabled from work."  (See id. Ex. G at U/A 0073.) Under such circumstances, Unum's decision to rely on the reports of two treating physicians, Drs. Miller and Halbrecht, made contemporaneously with or shortly after plaintiff's claimed onset of disability, rather than the subsequent reports of Dr. Newkirk, prepared substantially later in time, does not constitute an abuse of discretion.

Finally, to the extent plaintiff, in support of her position on the merits, relies on the SSA's February 13, 2004 decision, such argument is unavailing.  As discussed above, the Court, in evaluating whether Unum abused its discretion, is limited to an examination of the administrative record.  See Abatie, 458 F.3d at 970.

Based on a review of the administrative record, the Court concludes Unum did not abuse its discretion in denying plaintiff's claim for disability benefits.

//

//

**CONCLUSION**

For the reasons stated, defendant's motion for judgment is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: July 14, 2008

MAXINE M. CHESNEY
United States District Judge